UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO.:   21cr10027 |
| v. | ) | Violation(s); |
| ANTHONY JAY PIGNATELLO, | ) | Count One:  Conspiracy to Commit Securities Fraud |
| Defendant | ) | (18 U.S.C. § 371) |
| | ) | Forfeiture Allegation: |
| | ) | (18 U.S.C. § 981(a)(1)(C) & 28 U.S.C. § 2461(c)) |

INFORMATION

At all times relevant to this Information:

General Allegations

Key Persons and Entities

1. The defendant, ANTHONY JAY PIGNATELLO ("PIGNATELLO") was a person living, variously, in Virginia and California.

2. Together with its predecessor entities, Cannabiz Mobile, Inc. ("Cannabiz Mobile") was a company based in Massachusetts that purported to be, at various times, in the medical device manufacturing, mineral exploration and medical marijuana businesses.  From in or about and between March 2007 and August 2012, the company was known as ReBuilder Medical Technologies, Inc. ("ReBuilder"), and its shares traded on the over-the-counter ("OTC") securities markets under the ticker symbol RBRM.  In or about August 2012, the company was renamed Lion Gold Brazil, Inc. ("Lion Gold") and its shares traded on the OTC market under the ticker symbol LGBI.  In or about June 2014, the company was renamed Cannabiz Mobile.  Since that time, its shares have continued to trade on the OTC market under the ticker symbol LGBI.

1

3. Co-Conspirator #1 ("CC-1") was an individual who resided in Massachusetts. In or about May 2012, CC-1 gained control of ReBuilder, the predecessor of Cannabiz Mobile, through a closely held entity, Lionshare Ventures, LLC ("Lionshare"), which CC-1 also controlled.

4. In or about April 2014, Co-Conspirator #2 ("CC-2") became the chairman, president, and chief executive officer ("CEO") of Cannabiz Mobile, which was then known as Lion Gold.

5. PIGNATELLO served as either a consultant to Cannabiz Mobile (and its predecessor entities) or as the company's corporate secretary and, along with CC-1, exercised control over the company.

6. The Securities and Exchange Commission ("SEC") is an independent agency of the executive branch of the United States government. The SEC is responsible for enforcing the federal securities laws and promulgating rules and regulations in keeping with the same.

General Background and Definitions

7. Shares, or "securities," of publicly traded companies (known as "issuers") that are acquired directly from the issuers, and are not registered with the SEC, generally cannot be sold to the public. Such shares are considered "restricted," and bear a legend indicating that fact on their face. Shares that are registered with the SEC, and that do not bear a legend indicating they are restricted, are considered "free-trading," and may be bought and sold in the public market.

8. Convertible notes are a form of debt that may be issued by a company and that may, under certain circumstances, be exchanged for a pre-determined number of shares of stock directly issued by the company.

9. Rule 144 of the Rules and Regulations promulgated by the SEC ("Rule 144") sets forth conditions for the sale of restricted securities by individuals or entities who are deemed "affiliates" of the issuers. An "affiliate" is, among other things, a person or entity who directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the issuer.

10. Transfer agents are SEC-registered entities retained by issuers to maintain accurate investor records and to issue or cancel stock certificates.

11. A "pump-and-dump" scheme typically involves an effort to artificially inflate the stock price or trading volume of a publicly traded company (the "pump") so that individuals who control a substantial portion of the company's stock can sell their shares at artificially high prices, or in a more liquid market, to other investors (the "dump"). Typically, such schemes involve the use, among other means, of news release and other forms of promotion—often containing false or exaggerated information—to inflate the stock price and trading volume and generate demand for the shares.

Overview of the Conspiracy

12. In or about and between June 2011 and February 2015, in the District of Massachusetts and elsewhere, the defendant, ANTHONY JAY PIGNATELLO, together with others known and unknown to the United States Attorney, conspired to engage in a scheme to defraud and to employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of shares of Cannabiz Mobile.

Object of the Conspiracy

13. The principal purpose and objective of the conspiracy was to make money by (a) concealing CC-1's and PIGNATELLO's control over Cannabiz Mobile, in order to evade reporting requirements and restrictions on the sale of stock by affiliates of the company, and (b) engaging in a pump-and-dump scheme in connection with the shares of Cannabiz Mobile.

Manner and Means of the Conspiracy

14. Among the manner and means by which PIGNATELLO and co-conspirators known and unknown to the United States Attorney carried out the conspiracy were the following:

   a. Hiding from investors and from the company's transfer agent that CC-1 and PIGNATELLO controlled Cannabiz Mobile.

   b. Installing corporate officers at Cannabiz Mobile who secretly acted at the direction of CC-1 and PIGNATELLO.

   c. Obtaining legal opinion letters falsely attesting that CC-1 and Lionshare were not affiliates of Cannabiz Mobile in order to cause the transfer agent to issue them free-trading shares of the company's stock.

   d. Arranging for a stock promotion campaign intended to increase Cannabiz Mobile's stock price and trading volume so that they could secretly sell shares of the stock at artificially inflated prices.

Overt Acts

15. On or about various dates between June 2011 and February 2015, PIGNATELLO and co-conspirators known and unknown to the United States Attorney committed and caused to be committed the following overt acts, among others, in furtherance of the conspiracy:

16. In or about and between June 2011 and June 2012, CC-1 raised more than $500,000 from investors through an unregistered offering of shares in Lionshare, which CC-1 described as a "business incubator for microcap companies."

17. In or about May 2012, CC-1 acquired control of ReBuilder, a purported medical device company with shares that traded on the OTC market, by using approximately $75,000 of the Lionshare investor money to purchase convertible notes representing ReBuilder's outstanding debt. The notes were convertible into more than 700 million shares of ReBuilder's common stock. CC-1 assigned four of the notes to a family member, and one of them to Lionshare.

18. On or about March 5, 2014, PIGNATELLO emailed CC-1: "[y]ou need to make it a priority to add someone friendly to the Board and someone that can sign things for us here (will speed everything up)."

19. In or about April 2014, CC-1 caused CC-2 to be hired as the chairman, president, and CEO of the company, which was then known as Lion Gold.

20. In or about June 2014, CC-1 and PIGNATELLO caused the company's name to be changed to Cannabiz Mobile.

21. PIGNATELLO and CC-1 took steps to hide from the company's transfer agent and others that CC-1, PIGNATELLO, and Lionshare controlled Cannabiz Mobile—including by providing false and misleading documents to the transfer agent that falsely represented that CC-

1, PIGNATELLO, and Lionshare were not affiliates of the company—thereby causing the transfer agent to issue, to themselves and others, millions of shares in the company that were improperly designated as free-trading instead of restricted.

22. In or about October 2014, with free-trading shares at their disposal, PIGNATELLO and CC-1 arranged for a stock promotion campaign intended to increase Cannabiz Mobile's stock price and trading volume.

23. PIGNATELLO and CC-1 sold or attempted to sell securities of Cannabiz Mobile during the period of the promotion campaign and in the months that followed.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

## COUNT ONE
### Conspiracy to Commit Securities Fraud
### (18 U.S.C. § 371)

24. The United States Attorney re-alleges and incorporates by reference paragraphs 1 through 23 of this Information as if fully set forth herein, and charges:

25. In or about and between June 2011 and February 2015, in the District of Massachusetts and elsewhere, the defendant,

ANTHONY JAY PIGNATELLO,

conspired with CC-1 and others known and unknown to the United States Attorney to commit an offense against the United States, specifically, securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a), and Title 17, Code of Federal Regulations, Section 240.10b-5, that is: to knowingly and willfully, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of a national securities exchange, directly and indirectly use and employ manipulative and deceptive devices and contrivances in connection with the purchase or sale of securities, in contravention of Rule 10b-5 of the Rules and Regulations promulgated by the Securities and Exchange Commission, by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which would and did operate as a fraud and deceit in connection with the purchase and sale of securities, specifically, shares of Cannabiz Mobile, which traded on the OTC market under the ticker symbol LGBI.

All in violation of Title 18, United States Code, Section 371.

## FORFEITURE ALLEGATION

26. Upon conviction of the offense in violation of Title 18, United States Code, Section 371, as set forth in Count One of this Information, the defendant,

## ANTHONY JAY PIGNATELLO,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offense.

27. If any of the property described in Paragraph 26 above, as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C), as a result of any act or omission of the defendant:

  (a) cannot be located upon the exercise of due diligence;

  (b) have been transferred or sold to, or deposited with, a third party;

  (c) have been placed beyond the jurisdiction of the Court;

  (d) have been substantially diminished in value; or

  (e) have been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of the property described in Paragraph 26 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

                          ANDREW E. LELLING
                          United States Attorney

By: _____
     JAMES R. DRABICK
     Assistant U.S. Attorney

Dated: January 25, 2021